# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JONATHAN VANLOAN,

        Plaintiff,

    v.

THE NATION OF ISLAM, LOUIS FARRAKHAN,
TONY MUHAMMAD, THE CITY OF
SANTA ANA, CALIFORNIA, LYSETTE MURILLO,
GIL ANDRES,  DAVID VALENTIN, JASON
VIRAMONTES, KENNETH GOMINSKY,
ENRIQUE ESPARZA, ERIC PAULSON, MARTHA GUILLEN,
NORMAN SBABO, MARK PEREZ, MANUEL
VERDIN, DAVID REYES, BENITA ESPARZA,
LETICIA CAUBLE, VINCENT RODRIGUEZ,
DANIEL GARCIA, IUPELI MANEAFAIGA,
RUBEN CAMPOS, ERNEST VILLEGAS ,
CHELSEA RAMIREZ, CLAUDIA AUDELO.
OMAR PEREZ, VICTOR MOYAO, SUSAN
THOMAS-REED, MICHELLE MONREAL,
SANDRA GALLEGOS, TERESA RUELAS,
LUIS GARCIA, VINCENT GALAZ, LAURA
SANTOS, MARY RODRIGUEZ, VANESSA
CLARKSON, ANDREW HERRERA,
FRANCISCO JUAREZ,  RICK ZAVALA,
EDGAR PEREZ, MELANIE QUINGAIZA,
SAMUEL RIVERA, PEDRO LUNA, CAROLINE
CONTRERAS, GUSTAVO RIVERA, CLAUDIA
SMITH, MELINDA MENDOZA, MARGO TODD,
CODY MCCOY, MIGUEL PULIDO, DAVID
PENALOZA, PHILLIP BACERRA, VICENTE
SARMIENTO, JUAN VILLEGAS, JOSE SOLORIO,
SANTA ANA POLICE OFFICERS ASSOCIATION,
INC., THE CITY OF FOUNTAIN VALLEY, CA,

CIVIL ACTION NO.:
42 U.S.C. § 1983
CIVIL RIGHTS
COMMON LAW TORTS
JURY TRIAL DEMAND

1

KEVIN CHILDE, RICARDO CENDEJAS,
SHERWIN BURGOS,
PROVIDENCE HEALTH & SERVICES, INC.,
RODNEY F. HOCHMAN, M.D., JAMES PIEROG,
M.D., AMY COMPTON-PHILLIPS, M.D.,
"DOE DEFENDANTS 1-50",

        Defendants.

## COMPLAINT

## THE NATURE OF THIS CIVIL RIGHTS LAWSUIT IN
## THE EASTERN DISTRICT OF PENNSYLVANIA

1.   This Lawsuit is Plaintiff's fourth filed Civil Rights Case against the Nation of

Islam ("N.O.I.", "Nation", "Black Muslims") and the now many Co-Conspirators who

have aided and abetted the N.O.I.'s, seven-year, multi-state Campaign of Terror and

Attempted Murder against Plaintiff. Prior filings have been in the District of Arizona, and

in the Central District of California. A brief Procedural History of Plaintiff's prior filings

will be recounted below.

2.   Plaintiff grew up in Lionville, Pennsylvania, graduated Coatesville High School in

1976, practiced law in Chester County for a period in the Nineties, has spent 39 of his 62

years collectively, in Pennsylvania, his 91 year old Mother still lives in Malvern, PA,

Plaintiff is registered to vote here, and carries a PA Driver's License. Plaintiff considers

Pennsylvania his Domicile.  Pennsylvania is his home.

3.   Venue is sought in this District for two reasons, Plaintiff experienced many Acts of

Domestic Terrorism and two Discreet Attempts on his Life by the Nation of Islam, during

the Spring and Summer of 2019, while he was living in Chester County. The second

reason Plaintiff is seeking venue in this District is that the Judges in the Ninth Circuit

have dismissed, or are waiting to dismiss, Plaintiff's  prior cases as "frivolous", lacking

subject matter jurisdiction, on the grounds that Plaintiff's Factual Allegations alleging a

Conspiracy are "fantastical", "improbable", and lacking "merit".

4.   The reality is that, for some reason, the Ninth Circuit is protecting the Defendants in Plaintiff's previously filed cases. There is no single case in the history of the federal courts, where a Plaintiff alleged what VanLoan is alleging, that he got in the crosshairs of the Black Muslims, for private protected speech the Nation deemed "racist", and the Nation then conspired to murder him, and attempted to murder him, in multiple states, aided and abetted in those murder attempts, by municipal law enforcement officers, and many others.

5.   Because there is no legal precedent for a Dismissal of Plaintiff's case based on his Facts, there is no legal *basis* for Dismissal either. Judges are not supposed to pre-judge a plaintiff's factual allegations, unless they are obviously about "little green men".  Anyone who knows anything about the Nation of Islam, and its history, knows that Plaintiff's allegations are, most assuredly, well within the realm of possibility, therefore not "fantastical".

6.   There are many people now, perhaps thousands of people, who know about the Conspiracy to Murder VanLoan. The Department of Justice knows about the Conspiracy, but because VanLoan's life has no value to DOJ, it has declined to investigate and file charges, even though the Department claims "Terrorism" is one of its priorities. Plaintiff used to feel frustration about this state of affairs, but now accepts it.

7.   Absent a criminal investigation, the only remedy Plaintiff has left to fight back are civil suits and they have not been easy. But, the Constitution of the United States guarantees a Right to a Jury Trial in Civil Cases, and Plaintiff has not yet been deterred

by the refusal of federal judges in the Southwest and on the West Coast to follow the law, and allow him to conduct discovery and go to trial. (Like the first Judge in his Arizona Case, Thomas J. Ferraro, was doing, allowing Plaintiff to conduct discovery, before Judge Ferraro's jurisdiction was usurped by Chief Judge Raner Collins, who entered the case, only to dismiss it.)

## HOW PLAINTIFF GOT IN TROUBLE WITH THE NATION OF ISLAM IN LOS ANGELES, CA

8.  On Saturday night, December 14, 2013, at approximately 10:00 P.M., a man Plaintiff had never met before, Vince Allen, physically threatened him, at the apartment of Annette Pike, Allen's girlfriend, in the Van Buren Apartments, on Van Buren Avenue, in South Los Angeles. Ms. Pike, whom Plaintiff had met previously, had invited Plaintiff to stay for a few days, as it was nearing Christmas.

9. After fleeing Ms. Pike's apartment, VanLoan, from his car in Santa Monica, CA, sent some private text messages to his then African-American girlfriend Brandy M. Thomas, who was still at Ms. Pike's apartment.

10. In those messages, in anger, Plaintiff used the "N-word" in reference to Mr. Allen, and said some other (very) disparaging things about him.

11. Mr. Allen got ahold of Ms. Thomas' cell phone, and those text messages, and took it (them) to Nation of Islam Muhammad Mosque # 27 on South Vermont Avenue in South Los Angeles, and Student Minister to Louis Farrakhan Tony Muhammad, where, according to Ms. Pike, who later told VanLoan, the Nation of Islam designated Plaintiff a "Person of Interest".

12. VanLoan subsequently determined that a "Person of Interest" in Black Muslim parlance, is someone the Nation of Islam will kill, if they can.

13. Beginning on January 1, 2014, in downtown Los Angeles, the N.O.I. commenced a Campaign of Terror and Attempted Murder against Plaintiff, which has now lasted almost seven years, and traversed six states (CA, NM, UT, AZ, FL & PA).

14. During the Terror Campaign, the Nation of Islam has been aided and abetted by Police Officers, fire department paramedics and other law enforcement personnel in the following Municipalities-- Los Angeles, Albuquerque, Tucson, Torrance, Culver City, Santa Monica, Santa Ana, Fountain Valley, San Diego, Santa Barbara and Manatee County, Florida.

15. After a particularly virulent series of attempts on his life in Tucson, Arizona, during May 3-5, 2017, involving uniformed Tucson Police Officers and Tucson Fire Department Paramedics, Plaintiff felt he finally had enough evidence of a Conspiracy to Commit Murder, and Attempts to Murder, to begin fighting back in federal court.

## PROCEDURAL HISTORY OF PLAINTIFF'S PRIOR CIVIL RIGHTS CASES- WHY PLAINTIFF IS SEEKING VENUE IN THE THIRD CIRCUIT?

16. After struggling with all of the legal requirements involved in filing a federal lawsuit, during the Summer of 2017, Plaintiff filed his first Complaint in the California Central District on September 19, 2017. (2:17-cv-08912-RGK=AS)

17. Plaintiff's primary intention, in filing this first suit, was to create a "Record" of what had happened since January 1, 2014, in case *something should happen* to him.

18. The Complaint includes 54 pages of nightmarish, macabre Factual Allegations. (Complaint, pp. 4-58) Plaintiff had not complied with Tort Claim Notice procedures, nor he was he yet aware of the thorny pleading standards or timing for 42 U.S.C. 1983 lawsuits, so he alleged a arcane theory of recovery in this suit, a civil remedy under a federal criminal terrorism statute, which he, at that time assumed was his only *possible* remedy.

19. On the Ninetieth Day after filing the Complaint, Judge R. Gary Klausner issued an Order to Show Cause why the Case should not be Dismissed for Lack of Prosecution, requiring Plaintiff to respond in writing by December 28, 2017. (Dkt. 9)

20. On December 28, 2017, Plaintiff filed a Motion for an Extension of Time in which to Serve the Defendants, and the Court scheduled a Hearing on the Motion for January 29, 2018. (Dkt. 10)

21. Notwithstanding Plaintiff's timely filed Motion, Judge Klausner canceled the Hearing on same, on January 23, 2018 (Dkt. 12) and subsequently "terminated" the case on February 6th, 2018. (Dkt. 14)

22. This was Plaintiff's first experience with the Ninth Circuit's disposition toward his civil rights cases.

23. Plaintiff did not appeal this Case "Termination", because he saw no legal basis for an Appeal.

## PLAINTIFF'S ARIZONA LAWSUIT

24. In April, 2018, Plaintiff returned to Tucson so he could file a second case for Acts of Terrorism and Attempted Murder in Arizona during the period October, 2016, through May, 2017.

25. He had timely complied with Arizona Tort Claim Notice requirements and was ready to allege Constitutional deprivations under 42 U.S.C. 1983.

26. Before he could begin drafting his new Complaint, though, Plaintiff was falsely arrested by the Tucson Police, who alleged that he had threatened the nurses at St. Joseph's Hospital, the very same nurses who were Defendants in his Tucson Complaint, including Charge Nurse Jilian Marie Huggins, for two very very close call Murder Attempts on his life in the St. Joseph's Hospital Emergency Room, during May 3-5, 2017.

27. Plaintiff spent a miserable two weeks in Banner Psychiatric Hospital, only to be released with just a few days left to file his Complaint, before the Statute of Limitations on his state law claims ran.

28. Plaintiff did indeed timely file his Complaint on April 30, 2018. (4:18-cv-00226-DTF) In that Complaint are thirty-two pages of accurate Factual Allegations, covering events in Arizona from October 4, 2016, through May 5, 2017, with in excess of seventy named Defendants.

29. Magistrate Judge Thomas Ferraro, to whose Jurisdiction Plaintiff had consented (Dkt. 5), allowed the Case to proceed into Discovery and Plaintiff had begun to

field, and respond to, his first of the obligatory Defendant's Motions to Dismiss (Dkt's. 8-86)

30. Inexplicably, and patently illegally, the Chief Judge of the District of Arizona, Raner C. Collins, entered the case on August 17, 2018, taking the case over from Judge Ferraro, and dismissed Plaintiff's Complaint, without hearing, without leave to amend, with prejudice, saying the case was "frivolous" and the Court lacked subject matter jurisdiction to hear it. (Dkt. 87)

31. Plaintiff timely filed his Notice of Appeal of the Dismissal Order on September 18, 2018. (Dkt. 89)

## THE APPEAL OF THE TUCSON, ARIZONA CASE
## (18-16813)

32. On February 18, 2018, Plaintiff filed his Opening Brief (Dkt. 13) after painstaking research into why Raner Collins inane and inarticulate Dismissal Order entered August 20, 2018 is legally incorrect.

33. There is no case in any Circuit which says a judge can sua sponte dismiss a case because he says the factual allegations are "implausible", without any objective rational basis for their implausibility ("*Neitzke* v. *Williams*, 490 U. S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"). The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel. That is not what we have here." (*Ashcroft v. Iqbal* 556 U.S. 662, 696 (2009), Souter, J., dissenting)

34. The crux of Plaintiff's argument on Appeal was that there is no legal justification for dismissing his Case, just because a judge says he doesn't believe Plaintiff's factual allegations.

35. After a number of Appellees filed Answering Briefs that produced absolutely no case precedent analogous to VanLoan's facts, supporting dismissal, VanLoan filed a Reply Brief in response Appellees' Briefs, on July 3rd, 2019. (Dkt. 66)

36. On December 13, 2019, the Ninth Circuit Three Judge Panel (Tashima, Wallace, & Canby) affirmed Raner Collin's Dismissal Order saying, obliquely, "The District Court properly dismissed VanLoan's action because VanLoan's claims are too frivolous and unsubstantial to invoke subject matter jurisdiction." (Dkt. 73)

37. VanLoan filed a Petition for Rehearing En Banc on January 24, 2020 (Dkt. 79), which was denied on March 24, 2020 (Dkt. 92), albeit with very odd timing, which will be discussed shortly.

## SECOND CALIFORNIA LAWSUIT - FIRST FILING

38. VanLoan had first filed this case on January 9, 2019, while he was on the East Coast, running from the Nation of Islam. (2:19-cv-00197-GW-MRW). The Facts of this Case involved very virulent attempts on his life in Los Angeles County, during the period January 5-13, 2018.

39. Plaintiff admittedly was writing a Brief for his Ninth Circuit Appeal, when he filed this new Case, from the East Coast, which new case had more than 50 Defendants.

40. Plaintiff's monetary resources were admittedly running very thin, to boot.

10

41. California Central District Magistrate Judge Michael J. Wilner, on January 31, 2019, issued a minute Order instructing Plaintiff that the Service Period would expire on April 9, 2019. (Dkt. 4)

42. Plaintiff had not seen such an Order before, which he thought odd.

43. VanLoan did, however, through his process server, Ace Attorney Service, Inc., on March 18, 2019, cause Summons to issue for all his Municipal Defendants. (Dkts. 5-32)

44. Also on the 18th, Plaintiff applied for permission to electronically file documents in the Case. (Dkt. 33)

45. On March 20, 2019, Judge Wilner issued the following Minute Order:

"Plaintiff is ORDERED to show cause why he has not violated Local Rule 41-6. Plaintiff may discharge this order by submitting a sworn statement made under penalty of perjury that clearly states: (a) his current mailing address; and (b) the reason(s) for his use of three addresses during the short pendency of this action. Plaintiffs sworn statement (not to exceed four pages) will be due by April 5. The Clerk is directed to serve this order on Plaintiff at all three of his known addresses. The Court defers consideration of the electronic filing request until it gains visibility on Plaintiffs location." (Dkt. 34)

46. The referenced CA Central District Local Rule gives the Court authority to dismiss a Pro-Se Plaintiff's case, with or without prejudice, if the Pro-Se Plaintiff fails to update his address.

47. VanLoan was reluctant to reveal his exact whereabouts because of the threat to his life from the Nation of Islam.

48. VanLoan then knew that Wilner was looking for any reason to dismiss this Case, a case with many Defendants, significant liability, abundant evidence of wrongdoing, and huge damages.

49. In addition, at the last minute, Ace Attorney Service, Inc. refused to serve the Complaint and Summons upon the Municipal Defendants, without explanation.

50. VanLoan had no recourse but to beat Wilner to the punch, and voluntarily dismiss his own case, on April 5, 2019 (Dkt. 35), so that he could re-file the case at a more opportune time, knowing that he might lose some of his state law claims against the Municipal Defendants, but also knowing that Wilner was champing at the bit to dismiss the Case, presumably with Prejudice.

## SECOND CALIFORNIA LAWSUIT RE-FILED

51. The Nation of Islam made two attempts on Plantiff's life during the Summer of 2019, while Plaintiff was living in Chester County, Pennsylvania. The facts specific to those attempts will be discussed shortly in this Complaint.

52. With the knowledge that he was not safe even in Pennsylvania, Plaintiff, in August, 2019, reluctantly returned to California to be in a position to re-file his Second California case, which had a Statute of Limitations approaching on his 42 U.S.C. 1983 Claims, in January, 2019.

53. Sadly, there were vicious Attempts on Plaintiff's life in Orange County, California during November, 2019, which, along with the Attempts in Chester County,

PA, during the Summer, 2019, form the Factual Allegations of the instant Complaint, and will be discussed shortly.

54. By the Grace of God, Plaintiff personally re-filed his Second California Lawsuit, again in the CA Central District, on January 6, 2020. (2:20-cv-00127-GW-MRW)

56. This case was assigned to, not surprisingly, Judge George Wu, and Magistrate Judge Michael J. Wilner.

57. Plaintiff never consented to the referral of the case to Judge Wilner, either in the first filing of the case, or the second.

58. VanLoan effected service on thirteen of his Defendants during March, 2020, including the owner of Southern California Hospital, Prospect Medical Systems, Inc., where Plaintiff was almost murdered on Friday, January 12, 2018, in the Hospital Emergency Room. (Dkts. 71-83) (Exhibit 1 - Picture of Bruise the Administration of Heart Enlargement Medicine left on Plaintiff's right arm, ordered by Charge Nurse on Duty, Mir Nawaz Karim, for no legitimate medical reason, and with the intent to kill Plaintiff.)

59. The Providence Health & Services Defendants waived service of the Complaint on March 20, 2020 (Dkts. 66-69)

60. Gavin Newsom issued a Statewide Stay-at-Home Order (Executive Order N-33-20) on March 19, 2020, after which Plaintiff's Process Server, Ambush Process

Server, declined to further serve Defendants in the case, along with other process servers in Los Angeles County.

61. Having a premonition that a Motion to Dismiss might be forthcoming from the Prospect Medical Defendants, on March 23, 2020, Plaintiff filed an Amended Complaint. (Dkt. 85)

62. On the same day, Plaintiff also filed a Motion to Recuse Magistrate Judge Michael Wilner. (Dkt. 70)

63. Sure enough, despite Plaintiff having filed an Amended Complaint, the Prospect Medical Defendants filed a MTD his original Complaint the following day, March 24, 2020. (Dkt. 86)

64. What is ironic is the timing of the Prospect Medical Defendant's MTD- it coincided exactly with the Denial of Plaintiff's Petition for Rehearing En Banc, that very same day (March 24, 2020), by the Nintth Circuit Court of Appeals Three Judge Panel of Tashima, Canby and Wallace, in the Appeal of Plaintiff's Tucson case dismissal.

65. Did the Ninth Circuit Court of Appeals clear the way for Prospect Medical's Motion to Dismiss in the case? Was there communication between Prospect Medical's lawyers, and the Ninth Circuit COA, regarding the timing of the denial of VanLoan's Petition for Rehearing En Banc?

66. Did Ninth Circuit COA Chief Judge Sidney Runyan Thomas ever, in fact, circulate VanLoan's Petition for Rehearing En Banc to all active Judges, as is required by the Rules?

67. Judge Wu denied VanLoan's Motion to Recuse Michael Wilner on March 27, 2020. (Dkt, 90)

68. On April 6, 2020, VanLoan filed a Motion for Extension of Time in which to serve the remaining Defendants in the Case. (Dkt. 92)

69. On April 13. 2020, the Providence Health & Services Defendants filed a Motion to Dismiss VanLoan's Complaint for Failure to State a Claim. (Dkt. 94)

70. A Hearing was Set for the Providence MTD on June 17, 2020 at 9:30 A.M. in front of Judge Wilner. (Dkt. #106)

71. On May 7, 2020, Judge Michael J. Wilner filed his Report and Recommendation to Dismiss VanLoan's Complaint for lack of subject matter jurisdiction as "frivolous". (Dkt. 99)

72. On May 27, 2020, VanLoan filed his Objections to the Magistrate Judge's Recommendations. (Dkt. 103)

73. On May 28, 2020, VanLoan filed a Motion for Extension of Time to respond to the Providence Defendants' MTD. (Dkt. 105)

74. The Hearing on that Motion, set for June 17, 2020 in front of Judge Wilner, was vacated and taken off the calendar by Judge Wilner on June 10, 2020. (Dkt. 106)

75. Also on June 10, 2020, the Culver City, CA Defendants (including the Police Officers who conspired with the Nation of Islam to murder VanLoan at Southern California Hospital, on Friday, January 12, 2018, Steven Armenta and James Gladden) filed their Reply to VanLoan's Objections. (Dkt. 107)

76. There have been no subsequent Orders in this Case since June 10, 2020.

77. Plaintiff has no explanation for this lengthy "pause" in activity except to say that he has written many, many emails, to many people, including politicians, jurists, journalists, business people, and many others, about his attempts to seek redress of grievances in the Ninth Circuit. This private public relations campaign *may* be a reason why Judge Wu has not yet acted on Magistrate Judge Wilner's Recommendation to dismiss Plaintiff's Case as "frivolous". If the Judge, for some reason, is reluctant to actually dismiss the case, he certainly can try to kill it through attrition.

78. The above history is a primary reason why Plaintiff is seeking an alternative venue for the instant Complaint. It does not make sense to file another Complaint in the Ninth Circuit, which would be tantamount to the definition of insanity (doing the same thing, over and over again….)

## JURISDICTION AND VENUE

79. The District Court has federal question jurisdiction to hear this case, pursuant to 28 U.S.C. § 1331, as Plaintiff is alleging deprivations of guaranteed U.S. Constitutional Rights under 42 U.S.C. § 1983. The Court also has diversity jurisdiction, pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiff, a Domiciliary, Citizen and Resident of Pennsylvania, and all Defendants, who are Domiciliaries and Citizens of States other than Pennsylvania, and the amount in controversy exceeds $75,000. Pendent jurisdiction to hear Plaintiff's common law claims, is found pursuant to 28 U.S.C. § 1367. The elements of Plaintiff's common law claims

are essentially the same in California and California, so applying California law in this District will not be difficult.

80. Venue is proper in this District, pursuant to 28 U.S.C. § 1391 (b)(2), as a substantial part of the events or omissions giving rise to the Claims herein occurred in this District, during the Spring and Summer of 2019, while Plaintiff was living in Chester County.  Further, from the beginning of his litigation, Plaintiff has continued to allege a Conspiracy among the Defendants in his lawsuits, including this Lawsuit, to deprive him, under color of law, of his Constitutionally guaranteed rights, including **life, liberty, speech, religion, against unlawful seizure, due process (access to the courts) equal protection of the laws.**

## PARTIES

81. Plaintiff Jonathan A. VanLoan is a Citizen and Domiciliary of the Commonwealth of Pennsylvania, with a mailing address of 12 Westgate Circle, Malvern, Pennsylvania 19355.

82. The Nation of Islam is a Black Nationalist Organization, with a headquarters address of Mosque Maryam, 7351 South Stony Island Avenue, Chicago, IL 60649. Louis Farrakhan is the titular leader of the Nation of Islam, also with a primary address of Mosque Maryam, 7351 South Stony Island Avenue, Chicago, IL 60649. Tony Muhammad is Student Minister to Louis Farrakhan, with an office address of, Nation of Islam Muhammad Mosque #27, 8701 South Vermont Avenue, Los Angeles, CA 90044. Tony Muhammad has orchestrated the Conspiracy to Murder VanLoan for the Nation of

Islam, from the beginning. The Nation of Islam operates a Mosque in this District, which is Muhammad Mosque #12 at 2508 North Broad Street, Philadelphia, PA 19132. Together, for the purposes of setting forth Claims below, these Defendants will be referred to as the **"Nation of Islam Defendants"**.

83. The City of Santa Ana, CA, is, upon information and belief, a municipal corporation organized under the laws of California, with a City Clerk's address of 20 Civic Center, Santa Ana, CA 92701.

84. Miguel Pulido, David Penaloza, Phillip Bacerra, Vicente Sarmiento, Juan Villegas, Jose Solorio were (are) the Santa Ana City Council Members on November 18, 2019, the date Plaintiff was almost murdered in the Santa Ana City Jail. They are the **"Santa Ana Local Governing Body Defendants"** and will be referred to as such for the purposes of the Claims below. Their address is the address of the City Clerk.

85. Gil Andres and Lysette Murillo are the two Santa Ana Police Officers who responded to a call from the Holiday Inn Express, the morning of Monday, November 18, 2019, after Plaintiff asked the Front Desk Clerk there to call, because he was afraid of being outside. They arrested Plaintiff and took him to the Santa Ana City Jail. The address of the Santa Ana Police Department is 60 CIvic Center Plaza, Santa Ana, CA 92701. After arriving at the Santa Ana City Jail, Plaintiff was never charged with a crime.

86. David Valentin is the Santa Ana Police Chief, Jason Viramontes is the Jail Bureau Commander, Kenneth Gominsky is the Deputy Chief of the Investigations Bureau, Eugene Esparza is the Deputy Chief of the Administration Bureau, and Eric

Paulson is Deputy Chief of the Field Operations Bureau. Together, they are the **"Santa Ana Police Supervisory Defendants"** and will be referred to as such below. The address of the Santa Ana Police Department is 60 CIvic Center Plaza, Santa Ana, CA 92701.

87. Martha Guillen, Norman Sbabo, Mark Perez, Manuel Verdin, David Reyes, Benita Esparza, Leticia Cauble, Vincent Rodriguez, Daniel Garcia, Iupeli Maneafaiga, Ruben Campos, Ernest Villegas, Chelsea Ramirez, Claudia Audelo, Omar Perez, Victor Moyao, Susan Thomas-Reed, Michelle Monreal, Sandra Gallegos, Teresa Ruelas, Luis Garcia, Vincent Galaz, Laura Santos, Mary Rodriguez, Vanessa Clarkson, Andrew Herrera, Francisco Juarez, Rick Zavala, Edgar Perez, Melanie Quingaiza, Samuel Rivera, Pedro Luna, CarolineContreras, Gustavo Rivera, Claudia Smith, Melinda Mendoza, Margo Todd, and Cody Mccoy are all Santa Ana City Jail Police Officers who, representing two time shifts, were on duty in the Santa Ana City Jail on November 18, 2019, the date that Plaintiff was, without being charged with any crime, arrested and brought to the Santa Ana City Jail, and detained there, for the sole purpose of being murdered in the Jail by a Black Muslim who was also in the Jail. One of these Police Officers, at least, acted as a "Whistle Blower" and alerted the Orange County Sheriff's Department about Plaintiff's plight. After about 10 hours detention, Plaintiff was "liberated" by Orange County Sheriff's Deputies, who came into the Jail at approximately 12 Noon on Monday, November 18, 2019, for the sole purpose of preventing Plaintiff's murder in the Santa Ana City Jail. These Defendants shall be

referred collectively as the **"Santa Ana City Jail Police Officer Defendants"** for the purpose of Claim presentation below.

88. The Santa Ana Police Officers' Association, Inc. is the "Police Union" of the Santa Ana Police Department, a Domestic Nonprofit Corporation organized under the laws of California, with an address of 1607 North Sycamore, Santa Ana, CA 92701. It will be referred to below as the "SAPOA". The SAPOA is, upon information and belief, a large part of the reason approximately fifty Santa Ana Police Officers would conspire to murder a U.S. Citizen in their City Jail, for the benefit of the Nation of Islam. The Agent for Service of Process for the SAPOA is Charles Goldwasser, Esq., with an office address of 15303 Ventura Boulevard, Suite 900, Sherman Oaks, CA 91403.

89. The City of Fountain Valley, CA, is, upon information and belief, a CA municipal corporation, with a City Clerk's Office address of 10200 Slater Avenue, Fountain Valley, CA 92708.

90. Kevin Childe is the former Police Chief of the Fountain Valley Police Department, who was Police Chief on November 19, 2019, when Fountain Valley Police Officers Ricardo Cendejas and Sherwin Burgos conspired with the Nation of Islam and the Santa Ana Police, among others, to murder Plaintiff, after Plaintiff called 911, when Plaintiff discovered that there was an Attempt on his life underway at the "Sober Living" house where he was living in Fountain Valley. Instead of making sure Plaintiff was safe, knowing there was an Attempt underway on Plaintiff's life, Officers Cendejas and Burgos abandoned Plaintiff to be murdered at his residence, and Plaintiff was, in fact,

almost murdered, after Officers Cendejas and Burgos left, requiring hospitalization. Upon information and belief, Chief Childe was "forced" into retirement the end of December, 2019, as the direct result of Fountain Valley Police conspiring to murder Plaintiff on November 19, 2019. Chief Child is a **"Supervisory Defendant"** for the purposes of Claims presented below.

91. Providence Health & Services, Inc. ("Providence") is, upon information and belief, a Nonprofit Corporation organized under the laws of the State of Washington, with a headquarters address of 1801 Lind Avenue SW, Renton, WA 98057. Providence owns St. Joseph's Hospital in Orange, CA, where Plaintiff went for help after his "escape" from the Santa Ana City Jail, on November 18, 2019. Rather than help Plaintiff, doctors, nurses and others in the St. Joe's Hospital Emergency Department further conspired, with the Santa Ana Police, to murder Plaintiff for the benefit of the Nation of Islam, and attempted to murder him. The Providence Health & Services, Inc. Defendants are private "state actors" for the purposes of Plaintiff's civil rights counts.

92. Rodney F. Hochman, M.D. is the President and CEO of Providence Health & Services, Inc. with an office address of 1801 Lind Avenue SW, Renton, WA 98057. Dr, Hochman is ultimately responsible for the care in Providence owned Hospitals.

93. James Pierog, M.D. is the Medical Director of the Emergency Department at Providence St. Joseph's Hospital in Orange. CA. The Hospital's address is 1100 W. Stewart Drive, Orange, CA 92868. He is responsible for the conduct of the employees in the Emergency Room of the Hospital.

94. Amy Compton-Phillips. M.D. is the Executive Vice-President and Chief Clinical Officer of Providence Health & Services, Inc. Dr. Phillips is ultimately responsible for the care at Providence owned Hospitals.

95. John "Doe Defendants 1-50" are yet to be identified and named Defendants in this Lawsuit, who aided and abetted the Acts and Actors herein, whose identities may yet be discovered, and Plaintiff will then Amend his Complaint and name them.

### FACTUAL ALLEGATIONS - EVENTS IN CHESTER COUNTY, PENNSYLVANIA, DURING SPRING AND SUMMER. 2019

96. Plaintiff was living in Phoenixville, PA during a good part of the Winter, Spring and Summer of 2019. He was working online as a self employed writer, including working on the Briefs for his Appeal of the Dismissal of his Tucson, Arizona Case, in the Ninth Circuit.

97. Plaintiff would routinely work in the Starbucks in Royersford, PA, and other coffee establishments, like Dunkin Donuts and Steel City Coffeehouse in Phoenixville, PA.

98. As Plaintiff is wont to do, and being mindful that the N.O.I. has a Mosque in North Philadelphia (Muhammad Mosque #12, Student Minister to Louis Farrakhan Rodney Muhammad) Plaintiff made U.S. Attorney William McSwain aware of his presence in Chester County in February, 2019.

99. Beginning the end of April and May, Plaintiff began to observe a unusual pattern of African-American males coming into the Royersford, PA Starbucks, located at 100 Diamond Way, #105, Royersford, PA 19468, while Plaintiff was working there. At

this time, Plaintiff had five years of experience of being surveilled and intimidated by Nation of Islam operatives in public places, in multiple states, so he knew when it was happening. The pattern in this instance would be an African-American male entering from the side entrance of the Starbucks, getting a coffee, then walking past Plaintiff's table, while glaring at Plaintiff, then exiting the front door. This would happen multiple times some days. It was extremely unnerving Plaintiff.

100. On Friday, May 17, 2019, when Plaintiff left the house were he was staying with a friend (500 Block of Washington Avenue, Phoenixville, PA) in the morning, as soon as he arrived on Bridge Street (which is the main street going through Phoenixville) Plaintiff began seeing African-American men on the street who he did not recognize as being from Phoenixville, and who seemed, from their attire and manner, to be perhaps from Philadelphia. (Plaintiff had previously lived in Phoenixville for five years (1999-2004), he knows Phoenixville.

101. One African-American Male of about 50 years of age, wearing a black Skull & Crossbones Tee shirt, when Plaintiff attempted to greet him as he walked by, in response to Plaintiff's forcibly cheery "Good Morning", said, in a low monotone, and malevolent manner, while looking at Plaintiff in the eyes, "Gooood Moooorning."

102. This was an abnormal occurrence in Plaintiff's experience, on Bridge Street in Phoenixville.

103. Plaintiff observed African-American Males in souped up cars on the Street, talking on cell phones.

104. Plaintiff felt sufficiently rattled and unsafe in Phoenixville, that he called a friend and left town for the day.

105. Plaintiff woke up early on Memorial Day, Monday, May 27, 2019, and, sitting in the living room near the front window of his friend's apartment, observed a car idling for quite a long period of time, on the street directly in front of the house.

106. Plaintiff called his friend's attention to it, and she was able to see that the driver behind the wheel was an Hispanic male.

107. In Tucson, AZ the previous year, the Nation of Islam had enlisted Hispanic Males in plots to murder Plaintiff.

108. The car eventually pulled away and Plaintiff's friend went to work. A few minutes later, Plaintiff noticed another vehicle idling in the same spot. This time Plaintiff went down and outside, and there was another Hispanic man behind the wheel of a different car. Plaintiff attempted to make eye contact with the man and went to the rear of his vehicle to observe him.

109. At that point he pulled away, and Plaintiff went back upstairs.

110. About 10 minutes later, Plaintiff's cell phone's SIM card was remotely deactivated and he lost his cellular phone connection, and the ability to call or text. The phone went dead.

111. Having experienced the N.O.I.'s ability to take control of his cell phones remotely in the past, Plaintiff immediately interpreted this as a sign of extreme danger.

24

112. Plaintiff immediately went downstairs and sat on the front porch. Just then a very scary Hispanic man with gang tattoos, walked by the house. The man looked at Plaintiff and keyed rapidly into his cell phone as he walked by.

113. Plaintiff surmised this person could be a hired assassin.

114. Plaintiff did not go back in the house, but started walking towards Bridge Street in Phoenixville. Plaintiff observed a Black Male carrying an open umbrella (it was a beautiful sunny day) walking in Plaintiff's direction.

115. As Plaintiff reached Bridge & Main Streets, he saw numerous African-American persons, some  driving in fancy cars, and others walking, and being aware of Plaintiff as he got closer to the center of town. Plaintiff was under surveillance, an Act of Terrorism he had experienced many times before, by the Nation of Islam.

116. Plaintiff headed into the Steel City Coffeehouse (which he had been patronizing off and on for twenty years) to think about what he should do.

117. In about 20-30 minutes, a trio of young African-American males came into the Coffeehouse, did not order beverages, and stood against a wall near Plaintiff.

118. Plaintiff took a photo of the men. In a few minutes he heard them say, "They want us to keep walking." Then, they left.

119. Plaintiff called a friend who picked him up, and they spent the rest of the day in Valley Forge Park.

120.  Plaintiff went back to his friend's house later that night, packed his belongings, and left early the next morning, staying out of Phoenixville for the next two

weeks. Plaintiff also emailed U.S. Attorney William McSwain about these events, on May 29th, 2019.

121. On Wednesday, July 3rd, Plaintiff was working at Dunkin Donuts at 218 Nutt Road in Phoenixville, when two Black Males entered the store and surveilled Plaintiff. It was sufficiently upsetting to Plaintiff that he wrote members of the Philadelphia City Council

122. On Tuesday, July 23rd, 2019, at about 3:00 P.M., Plaintiff was leaving the Steel City Coffeehouse in Phoenixville where he had been working on his laptop, and, parked immediately in front of the restaurant was a large black SUV with a Black Male in the driver's seat and a White Male in the front passenger's seat. When Plaintiff emerged, the Black Male looked over at Plaintiff with recognition in his eyes, nodded to the White Man, then the White Man looked over at Plaintiff. Plaintiff felt like this was not a coincidence and it made him nervous.

123. Plaintiff knew from vast experience that many Caucasians had aided and abetted the Nation of Islam, in its Terror and Attempted Murder Campaign against Plaintiff.

124. Later that night, at 11:55 P.M., Plaintiff received a call on his cell phone from a "Private Caller" and answered. All Plaintiff could hear on the other end was a man breathing. The caller said nothing, waited a few seconds, then hung up. Plaintiff became alarmed because he thought earlier that the White Man he had seen earlier that day outside the Steel City Coffeehouse might be a hit man. As that man could locate Plaintiff

from Plaintiff's cell phone, Plaintiff did not feel it was safe to remain at his friend's house. Plaintiff went to his friend's room and woke her up, and they both left. Plaintiff stayed away for several days.

125. The next day, Plaintiff wrote the Philadelphia District Attorney Larry Krasner and asked him if there was anything he could do to communicate with the Nation of Islam in Philadelphia and ask them to stop terrorizing Plaintiff.

126. At the end of August, 2019, Plaintiff returned, reluctantly, to California, so that he would be in position to re-file his second California Civil Rights lawsuit, which Plaintiff had voluntarily dismissed, in April, 2019.

127. Plaintiff located in Fountain Valley, California, which was close enough to Los Angeles and the Central District Courthouse, but not in Los Angeles County, and Plaintiff made an assumption that he would be safe in Orange County.

### FACTUAL ALLEGATIONS - EVENTS IN ORANGE COUNTY, CALIFORNIA, DURING OCTOBER AND NOVEMBER, 2019

128. Back in California, Plaintiff was on alert, but fervently hoping there would not be additional problems with the Nation of Islam.

129. But, the beginning of September, Plaintiff began to have problems, with the Nation of Islam, again. On Friday, September 6th, Plaintiff received a call from a Detroit # (313.828.6491), and a rough sounding African-American man harassed him on the phone.

130. African-American males again would locate Plaintiff in public places like Starbucks in Huntingdon Beach, and other coffee houses, and come in and surveil him.

Plaintiff made Orange County District Attorney Todd Spitzer aware of the problem via email, on September 10, 2019.

131. There were other similar problems in October, and the beginning of November, and they were upsetting to Plaintiff. Plaintiff continued to send emails.

### TERROR IN SANTA ANA, CALIFORNIA

132. On November 17, 2019, Plaintiff went to Santa Ana, California, to spend a quiet evening by himself at Motel 6, located at 1623 East First Street in Santa Ana..

133. About 1:00  A.M. on Monday morning, November 18th, Plaintiff became concerned that the Nation of Islam might be aware of his presence there. Before coming to Santa Ana that night, Plaintiff knew nothing about the City.

134. Plaintiff left his room and ran up to the front Office, but the man at the Front Desk did nothing to allay Plaintiff's concerns that there might be a safety issue. Plaintiff ran across the street to the Holiday Inn, but the Front Desk Clerk said there were no rooms available, which Plaintiff thought was odd, it was a Sunday night.

135. Plaintiff asked her if he could stay in the Lobby long enough to think about what to do next, but she said "No" so Plaintiff asked her to call the Police, as he did not want to be outside by himself.

136. Within about 10 minutes or so, Santa Ana Police Officers Lysette Murillo and Gil Andres responded. Officer Andres, after confirming that Plaintiff had called, told Plaintiff he had a choice, he could go with the Paramedics that Officer Andres would call, or Plaintiff could go to Jail for "a couple of hours".

137. Because Plaintiff has a history of attempts on his life by Municipal Fire Department Paramedics, in similar situations, Plaintiff chose to go to Jail.

138. Officer Andres then told Plaintiff that he was going to cuff him and that if Plaintiff resisted arrest, Office Andres would "break his jaw".

139. Plaintiff was transported to the Santa Ana City Jail, not charged with a crime, and placed in a cell. Plaintiff assumed that he would be released in a short amount of time.

140. After about 2 hours Plaintiff started to become concerned. There was no communication with Plaintiff by any of the Officers present, about his status. Plaintiff remained standing at his cell door to see if he could observe what was happening.

140. Plaintiff observed Police Officers at times walking to a cell a couple of cells away from Plaintiff's, and he heard them conversing with an African-American Male in that cell.

141. Plaintiff strained to hear the conversation and became aware that the Officers might be communicating with the African-American Male in that cell about Plaintiff, that's what it *sounded* like. At that point Plaintiff became alarmed because of his history of Municipal Police Officers aiding and abetting the Nation of Islam in the Nation's attempts to murder him.

142. Plaintiff perceived that the African-American man in the cell near Plaintiff's might be preparing himself to murder Plaintiff. Plaintiff is familiar, through past experience, with an Islamic "protocol" when a Non-Muslim is going to be murdered for

29

Allah, there are preparations, a ritual. Plaintiff had experienced it, in St. Joseph's Hospital Emergency Room in Tucson, Arizona, on Friday, May 5th, 2017, with a Muslim executioner of Middle Eastern descent.

143. At that point, Plaintiff began trying to get the attention of the Officers in the Jail to no avail. Plaintiff observed several males enter the Jail and take seats in the common area, but not processed in or out.

144. There was an Hispanic man who Plaintiff later learned was from El Salvador, and named Miguel, and a very sullen, dangerous looking white man.

145. A little while later, Plaintiff observed a Muslim man of Middle Eastern descent, with a Muslim beard, enter the Jail, go into an Office with a Middle Aged, Caucasian Police Officer for about 15 minutes, then emerge and take a seat with the other two men sitting in the common area.

146. This is when Plaintiff *knew* something very bad was happening, and that it was going to happen to *him*.

147. Officer Melanie Quingaiza, who had already taken Plaintiff out of his cell and fingerprinted him a couple of times, came and took Plaintiff again to the finger printing machine.

148. While Officer Quingaiza was very casually rolling Plaintiff's hand back and forth on the machine, Plaintiff was trying to keep his eye on the three men behind him, as he feared they might try to harm him, *at any moment*.

149. While Melanie was "fingerprinting" Plaintiff, she asked him:

**"How would you like your hair styled for your Service, would you like it longish like it is now, or would you like a nice neat hair cut?"**

150.  At that point Plaintiff's fears were confirmed, he had been brought to the Jail to be  murdered there by the Black Man in the Cell, and, presumably, the other men present in the common area, for the Nation of Islam.

151.  After she finished "fingerprinting" Plaintiff this time, Officer Quingaiza made Plaintiff sit in the common area near the three men, and that's when Plaintiff learned the Middle Eastern Man's name was  "Dalton", and that the Hispanic Man was "Miguel", and from El Salvador.

152.  Plaintiff became very nervous sitting near the men because they were looking at him with malevolence in their eyes, so Plaintiff asked Melanie to please put me back in a cell.

153.  She did, but this time she put Plaintiff in a cell where he had a view of the three men in the common area, and the  Command Desk of the Jail.

154.  Plaintiff observed various Officers continuing to communicate with the Black Man in the cell, and Plaintiff  felt that they were trying to encourage the Black Man to perhaps get ready for what was to  happen, but they were not rushing him, they were "deferring" to his "process".

155.  At this point, because Plaintiff now knew what was going to happen, he became terrified. Plaintiff tried praying but it was difficult because of his level of terror.

156. Plaintiff observed that it was now Morning and a new shift started to filter into the Jail. Plaintiff tried to make eye contact with various Officers, essentially pleading with his eyes for help, but it appeared to Plaintiff that everyone was in on the plan. No one appeared to be sympathetic about his plight.

157. Melanie took Plaintiff out one more time, and he pleaded with a Senior Officer at the Command Desk by asking him, "Don't you believe in God?" to which the Senior Officer replied, "That's a personal question, isn't it?"

158. Back in his cell, Plaintiff observed food being brought in, and it looked like the Jail Staff present might be enjoying a buffet – the occasion was for them some kind of celebration. They were enjoying themselves.

159. Several times when the Black Man appeared to be "ready", the entire Jail Staff left the Jail except for one Caucasian Police Officer, Miguel, Dalton, the dangerous sullen looking white man, and Plaintiff.

160. When they left, the Caucasian Jailer would go to the Black Man's cell, and signal that they were ready for him.

161. Each time the Jail cleared, Plaintiff started sweating bullets.

162. The last time the Jail cleared and the remaining Officer went to check with the Black Man, Plaintiff felt like this was "it". The Black Man was going to come into the Plaintiff's cell, or Plaintiff was going into the Black Man's cell.

163. This is when Plaintiff started praying in earnest. He called on "The God of Abraham, Isaac and Jacob", the God whom Plaintiff serves. Plaintiff called on Jesus

Christ His Son. Plaintiff tried singing a song he remembered from Church the previous day.

164. Even though Plaintiff is not Catholic, he prayed to Saint Ana for help. Plaintiff prayed *harder than he ever had his whole life.*

165. Suddenly, the Intercom started going off in the Jail. Plaintiff heard a voice saying "Pick up" or "Line 24, Pick up please", something like that.

166. Plaintiff observed the Caucasian Jailer walk quickly from the Black Man's cell to the Command Desk and pick up the phone and start speaking ardently with someone on the other line.

167. Soon Plaintiff observed other people coming quickly back into the Jail, and it looked like perhaps Officers from the Police Command Staff were coming in, a lot of people were coming into the Jail.

168. Plaintiff observed a lot of communication among the many persons now in the Jail, up at the Command Desk.

169. Plaintiff observed the Caucasian Officer who had been communicating with the Black Man walk quickly back over in the Black Man's Cell direction, pick up a portable gurney, and take it to a storage closet and stash it.

170. Soon, Plaintiff observed Orange County Department of Corrections Deputy Sheriffs came into the Jail.

171. Plaintiff also heard the voice of a female ask out loud, "Why wasn't he taken to the Orange County Jail"?

172. One of the Command Staff Officers at the Desk gave Plaintiff the all clear sign.

173. A big as a linebacker and boyishly handsome OC Deputy Sheriff came up to Plaintiff's cell door window, looked in and smiled.

174. It was a Miracle. Plaintiff had witnessed a Miracle.

175. It took about another 90 minutes for Plaintiff to be released. When he was released, the Police said they did not have his wallet with Plaintiff's Debit Cards, but gave Plaintiff his Pennsylvania Driver's license and his phone. (Plaintiff kept his Driver's License in his wallet.)

176. When Plaintiff was released, and left on foot, he learned that the Attempt to Murder him was not over. The Nation of Islam had a large contingent of operatives on the street in Santa Ana that day. They were following Plaintiff closely.


177. Plaintiff had no wallet or Debit Cards, so he had no way to get money to get home. It was a very nerve wracking experience, following on the heels of a terrible, nightmarish experience.

178. When Plaintiff tried to order an Uber from his phone, the only drivers the App was locating were Black Males or Muslim Males of Middle Eastern descent. Plaintiff's ride share App had been hacked.

179. Plaintiff asked a person in a bank where a Hospital was, then jumped on a bus to St. Joseph's Hospital in Orange (Providence Health & Services), because his nerves

were shot, he was having a severe asthma attack, and he needed time to think about a solution, about how to get safely home.

180. When he arrived, Plaintiff observed a Police car parked outside of the Hospital Emergency Room. This seemed like a bad omen, but Plaintiff went inside anyway, as he could barely breathe.

181. The E.R. Staff refused Plaintiff service, refused a breathing treatment, did not give him anything for his nerves, did not let him charge his cell phone, but did offer to call a taxi to take him home.

182. When the taxi arrived (Yellow Cab) the driver was a Muslim of Middle Eastern Descent. Plaintiff refused the cab.

183. Plaintiff crossed the street to a restaurant, charged his cell phone, then had an intuitive thought to log out of his Uber account and log back in. When he did and put in his destination, the App located a normal looking young Caucasian driver, which driver Plaintiff gratefully accepted.

184. Plaintiff thus made it safely home, only by the Grace of God, and lived to see the sun another day.

## ATTEMPT ON PLAINTIFF'S LIFE IN FOUNTAIN VALLEY, CA THE NEXT DAY, NOVEMBER 19, 2019

185. Plaintiff returned home to a "Sober Living House" located at 10052 Quail Avenue, Fountain Valley, CA 92708. California does not regulate these houses, anyone can operate them and anyone does.

186. On the evening of Tuesday, November 19, 2019, Plaintiff became concerned, at about 7:30 that evening, when he observed the other men in the house (three or four of them) seemingly systematically pack up their knapsacks and leave, which Plaintiff thought was very odd for all of them to do on a Tuesday evening, at relatively the same time.

187. That left "Peter" the House Manager and Plaintiff alone in the house by ourselves. Plaintiff had not yet recovered from his experience the preceding day.

188. Plaintiff went to Peter's room and asked him why everybody had left. Peter was not at all reassuring to Plaintiff, but said "You brought this problem with you."

189. Plaintiff had never discussed his trouble with the Black Muslims with anyone in the house, nor did he tell anyone that he had almost been murdered in the Santa Ana City Jail the previous day.

190. Plaintiff replied, "But do I have to be worried about my safety here, at a Sober Living House, Peter?"

191. Peter had no response to this question. Then, through an open window in Peter's room, Plaintiff heard an Hispanic accented male voice from outside at the front door call up to Peter. Peter jumped up off his bed and slammed the window shut.

192. Plaintiff became extremely alarmed, because earlier, after everyone had left, Plaintiff had locked the front door, and Peter had demanded that Plaintiff unlock it.

193. Peter had been encouraging Plaintiff to "Go to your room and lay down." But now Plaintiff knew what was going to happen - the other men had left the house because

they had been  tipped off that Plaintiff was going to be murdered in the house, by an apparently Hispanic assassin.

194. At that point Plaintiff went downstairs and called 911.

195. Officers Ricardo Cendejas and Sherwin Burgos responded relatively quickly. Plaintiff told them about his issues with the Nation of Islam, and that he felt his life was in danger again, in the Sober Living House.

196. The Officers' response was not encouraging, They seemed to be amused and they told Plaintiff to "Go to your room and lay down".

197. The same thing Peter had been saying, the exact words. Plaintiff knew immediately that the Officers were not going to help him, and his sense of it was, like had happened so many times before, the Police were conspiring with the Nation of Islam, and other Police Conspirators, to end Plaintiff's God-Given life.

198. When the Officers left without allaying Plaintiff's concerns that his life was in danger, the man Plaintiff knew only as "The Greek", who operated the Sober Living House,  who had arrived while the Police were there, and his House Manager, "Peter" then both demanded that Plaintiff take a drug test. This was the first time this had happened since Plaintiff had been living at the house.

199.  They gave Plaintiff a glass of water to drink, which The Greek had brought into the house from the garage out back, and suspicious about the contents, Plaintiff tossed it. Then The Greek and Peter said, "If you don't take a drug test, we will make you leave right now."

200. Plaintiff knew that the assassin he had heard earlier was probably waiting outside. Plaintiff was afraid to leave.

201. The Greek went back out to the garage where he had gotten the first glass of water, and, after a few minutes, he came back in with a second glass.

202. This time, Plaintiff drank the second glass of water.

203. When Plaintiff, reluctantly, drank the second glass, he knew immediately The Greek had spiked it with something. Within 30 seconds Plaintiff's heart started to constrict and he felt cardiac symptoms in his chest.

204. Plaintiff cried to The Greek, "What did you put in it?"

205. The Greek answered, "Fentanyl".

206. Plaintiff cried, "Why would you want to kill me?"

207. The Greek answered, "For the money"

208. Plaintiff, in extreme duress, called his 90 year old Mother in Malvern, and told her that he was dying, but not from drugs that he (Plaintiff) had voluntarily taken.

209. At that point Peter said to the Greek, "We should take him to the Hospital."

210. Peter said to Plaintiff, "Make sure you take your license."

211. Peter and The Greek transported Plaintiff, in extreme distress, to Orange Coast Memorial Hospital.

212. Once there, Plaintiff pleaded to the Staff to respond to him quickly as he was dying.

213. Plaintiff overheard The Greek say to Peter, "He will not be able to recover from this."

214. The Staff did respond quickly, took Plaintiff back and injected water into his bloodstream, and gave him medications.

215. Plaintiff was admitted to the Hospital and fell asleep.

216. The next day, the Doctors and Nurses encouraged Plaintiff to stay in the Hospital, that they wanted to keep him someplace "safe".

217. Plaintiff has this Rule, though, if government officials in a particular Municipality conspire to murder him for the Nation of Islam, Plaintiff does not stay in that town or city.

218. Plaintiff left the Hospital and returned to the Sober Living House, got his stuff, and decamped to San Diego to recover.

## CONDITIONS PRECEDENT

219. All conditions precedent required to file these claims, e.g., timely filed Tort Claim Notices, etc., have been met.

## RESPONDEAT SUPERIOR

220. All Employer Defendants herein, are vicariously liable for the Tortious & Negligent Acts of their Employee Defendants, acting in the scope of their employment, through the Doctrine of Respondeat Superior.

## CIVIL CONSPIRACY

221. Plaintiff alleges a Civil Conspiracy as against all Defendants-All Defendants have conspired together to deprive Plaintiff of his Constitutional Rights in the Counts below, and have injured him via the common law torts and negligent acts described herein (2) all Defendants have performed overt acts, including ratification, in furtherance of the Conspiracy; and (3) those overt acts have injured Plaintiff in his person or property, or have deprived Plaintiff of the rights and privileges, belonging to a Citizen of the United States.

## STATE ACTORS

222. All Private Defendants named in this Complaint, shall be considered State Actors, for the purposes of Plaintiff's 42 U.S.C. § 1983 Claims, as they aided and abetted the State Actors herein, in depriving Plaintiff of his U.S. Constitutionally guaranteed Rights to Life, Liberty, Freedom of Speech, Freedom of Religion, Freedom from Unlawful Seizure, Due Process of Law, and Equal Protection of the Laws.

## COUNT ONE - ASSAULT - AS AGAINST ALL NAMED DEFENDANTS

223. All preceding paragraphs are incorporated herein, as if fully set forth at length.

224. All Defendants, acting together, intending to cause harmful contact to Plaintiff, such that Plaintiff reasonably believed that he was about to be touched in a harmful and offensive way, and was in fear for his life.

## COUNT TWO - BATTERY (ATTEMPTED MURDER) - AS AGAINST ALL NAMED DEFENDANTS

225. All preceding paragraphs are incorporated herein, as if fully set forth at length.

226. All Defendants touched Plaintiff, or caused him to be touched, with the intent of harming and murdering Plaintiff; and Plaintiff did not consent to the touching; and Plaintiff was gravely and seriously harmed by this harmful and offensive touching; and a reasonable person in Plaintiff's situation would have been gravely harmed and offended by this touching.

## COUNT THREE - FALSE IMPRISONMENT - AS AGAINST ALL DEFENDANTS

227. All preceding paragraphs are incorporated herein, as if fully set forth at length.

228. All Defendants deprived Plaintiff of his freedom of movement by use of force or threats of force; that the threats of force compelled Plaintiff to remain somewhere he did not want to be; that Plaintiff did not consent to this confinement; that Plaintiff was harmed by this confinement; and that Defendants' conduct was a substantial factor in the egregious harms Plaintiff suffered as the result of this confinement.

## COUNT FOUR - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS - AS AGAINST ALL DEFENDANTS

229. All preceding paragraphs are incorporated herein, as if fully set forth at length.

230. All Defendants' conduct was outrageous; all Defendants intended to cause Plaintiff emotional distress; Plaintiff did suffer emotional distress of the most extreme variety, in that he was in imminent fear of being murdered by Defendants.

**COUNT FIVE - 42 U.S.C. SECTION 1983 - DEPRIVATION OF U.S. CONSTITUTIONAL RIGHTS UNDER COLOR OF LAW - FREEDOM OF SPEECH, FREEDOM OF RELIGION (CONST. AMEND I); FREEDOM FROM UNLAWFUL SEIZURE (IV); DUE PROCESS OF LAW (V, XIV); LIFE, LIBERTY, EQUAL PROTECTION OF THE LAWS (V, XIV) - AGAINST ALL DEFENDANTS**

231. All preceding paragraphs are incorporated herein, as if fully set forth at length.

232. All named Defendants, acting under Color of State Law, deprived Plaintiff of his guaranteed rights under the U.S. Constitution, namely, Life, Freedom of Religion, Freedom from Unlawful Seizure, Due Process of Law, Liberty, and Equal Protection of the Laws.

233. With specific regard to the Municipal Supervisory and Local Governing Body Defendants named in this Complaint, Plaintiff alleges liability for an official policy or custom that led to Plaintiff's injuries, and deliberate indifference by the Supervisory and Local Governing Body Defendants, to the Constitutional rights of Plaintiff, including his Right to Life, and failure to train their municipal police employee defendants, so those Defendants would not conspire to murder, and attempt to murder, Plaintiff, a White, Chrisitian man, for private protected speech, the Nation of Islam found offensive.

234. All Municipal Defendants are sued in both their Official, and their Individual Capacities.

## **PRAYER FOR RELIEF**

a.  Compensatory and punitive damages against all Defendants, Jointly &
    Severally, in the amount of $250,000,000,

b.  Any other relief deemed appropriate in these premises.

Respectfully Submitted,

/s/ Jonathan A. VanLoan, Pro-Se

Jonathan VanLoan, Pro-Se
32 Bank Street
Philadelphia, PA 19106
310.849.4556
9thcircuitplaintiff@gmail.com

November 30, 2020

